Before Hon. Richard K. Eaton, Sr. Judge
UNITED STATES COURT OF INTERNATIONAL TRADE

ADITYA BIRLA CHEMICALS USA INC and PACK PERFECT INC

Plaintiffs,

v.

DONALD J. TRUMP, *in his official capacity as President of the United States*; EXECUTIVE OFFICE OF THE PRESIDENT; the UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, *in his official capacity as Commissioner of United States Customs and Border Protection;* JAMIESON GREER, *in his official capacity as United States Trade Representative*; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE; HOWARD LUTNICK, *in his official capacity as Secretary of Commerce*,

**Comments on Remand**

Defendants.

Court No. 26-00134

**Motion to Lift Stay and for Issuance of Order Clarifying Refunds**

Plaintiffs Aditya Birla Chemicals Usa Inc and Pack Perfect Inc, by and through their attorneys hereby move for the issuance of an order lifting the stay on further proceedings in this matter and for the issuance of an order clarifying the issuance of refunds.

Summary:

Statement of Facts

On January 7, 2026 plaintiffs filed their court case challenging the constitutionality of the IEEPA duties imposed on imports. Plaintiffs Aditya Birla and Pack Perfect Inc have certain entries which included IEEPA duties and which were class 3 entries and subject to antidumping duties.

On January 9, 2026 the Court stayed the proceedings pending resolution of the issues before the Courts.

On February 20, 2026 the U.S. Supreme Court issued its opinion finding that the IEEPA duties were unlawful holding that "IEEPA does not authorize the President to impose tariffs." *Learning Resources, Inc. v. Trump*, No. 24-1287, slip op. at 20 (U.S. Feb. 20, 2026) (affirming *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025)).

Iin response to the decision of the Supreme Court, the Court of International Trade has issued an ongoing series of orders directing that CBP refund such IEEPA duties.

On April 20, 2026 the U.S. Customs Service launched the CAPE system, setting up a still evolving administrative mechanism for the issuance of refunds.

On July 14, 2026 this matter was assigned to Judge Richard K. Eaton

The CAPE system has not yet established procedures for the refund of IEEPA duties deposited on Type 3 entries. It is unclear whether or not such duties will be refunded prior to liquidation.

The Department of Commerce, as illustrated in the attached final determination and issues and decisions memorandum in *Silicon Metal from Australia: Final Affirmative Determination of Sales at Less Than Fair Value*, 91 Fed. Reg. 39593 (June 30, 2026) (Appendix I), is presently deducting IEEPA duties from U.S. Price in Antidumping Duty Administrative Reviews thereby increasing the Antidumping Duty rate. Commerce has continued to deduct such duties on the basis

that the IEEPA duties have not been refunded and that refunds are not certain. The Department stated:

> However, pursuant to section 772(c)(2)(A) of the Act, Commerce reduces CEP by any "the amount, if included in such price, of any … United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place delivery in the United States." Absent evidence that Simcoa received a refund for this charge, Commerce is unable to make a determination regarding an event that *might* occur in the future, nor is Commerce relieved from statutory direction to deduct import duties from CEP. *Silicon Metal from Australia; Issues and Decisions Memorandum* at 17 (Emphasis in Original)

Argument:

The Department of Commerce is presently significantly increasing the calculated Antidumping duties by treating the IEEPA duties as ordinary Customs Duties and deducting them from the U.S. selling price. In the final results for *Silicon Metal from Australia* ((A-602-813) the Department continued to deduct such duties on the basis that it could not know whether a refund "might" occur in the future and thus Commerce is not relieved from the statutory direction to deduct import duties. Without arguing the point as to whether or not the Commerce Department's position is supported by the law, this Court should clarify that the refunds will occur. Plaintiffs note that as liquidation cannot occur until the Antidumping Duty review is completed, it is presently impossible to avoid this artificial increase in the Antidumping Duties.

The Court should correct this problem by issuing an order clarifying that the IEEPA duties collected on type 3 entries were unlawfully imposed and must ultimately be refunded. The Court should also instruct CBP to create another module for the CAPE system to refund the IEEPA duties collected on Type 3 entries without waiting for liquidation – an event that might occur several years in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court grant the following relief:

a. Lift the Stay of further proceedings for this matter;

b. Issue an order clarifying that all IEEPA duties collected on type 03 entries are unlawful and must be refunded;

c. Issue an order directing U.S. Customs and Border Protection to implement a further phase in CAPE providing for the immediate refund of IEEPA duties collected on type 03 duties without waiting for liquidation of such entries and

d. Grant any such other relief as this Court may deem just or proper.

Respectfully submitted,

/s/ David Craven
David Craven
Craven Trade Law LLC
3744 N Ashland
Chicago, IL 60613
773 709-8506

*Counsel to* Aditya Birla Chemicals Usa Inc and Pack Perfect Inc.

Dated: July 28, 2026

Appendix I

Federal Register Notice in

**Silicon Metal From Australia: Final Affirmative Determination of Sales at Less Than Fair Value, 91 Fed. Reg. 39593 (June 30, 2026)**

**and**

Issues and Decisions Memorandum

Federal Register / Vol. 91, No. 124 / Tuesday, June 30, 2026 / Notices 39593

## Background

On July 2, 2003, Commerce published the *Japan Order* in the **Federal Register**, and on October 1, 2003, Commerce published the *China Order* in the **Federal Register**.[1] On March 2, 2026, Commerce published the notice of initiation of this fourth sunset review of the *Orders*, pursuant to section 751(c) of the Tariff Act of 1930 (the Act).[2]

On March 17, 2026, Commerce received a timely and complete notices of intent to participate in the sunset reviews for domestic interested parties within the deadline specified in the 19 CFR 351.218(d)(1)(i).[3] The domestic interested party claimed the interested party status within the meaning of section 771(9)(C) of the Act as U.S. producers of the domestic like product.[4] On March 24, 2026, Commerce notified the U.S. International Trade Commission (ITC) that it had received a notice of intent to participate from the domestic interested parties.[5]

On April 1, 2026, pursuant to 19 CFR 351.218(d)(3)(i), domestic interested parties filed timely and adequate substantive response.[6] Commerce did not receive a substantive response from any respondent interested party. On April 29, 2026, Commerce notified the ITC that it did not receive substantive response from any respondent interested parties.[7] As a result, pursuant to section 751(c)(3)(B) of the Act and 19 CFR 351.218(e)(1)(ii)(C)(2), Commerce is conducting expedited (120-day) sunset reviews of the *Orders*.

## Scope of the Orders

The product covered by these *Orders* is PVA from Japan and China. For the full description of the scope of the *Orders, see* the Issues and Decisions Memorandum.[8]

## Analysis of Comments Received

A complete discussion of all issues raised in these sunset reviews, including the likelihood of continuation or recurrence of dumping in the event of revocation of the *Orders* and the magnitude of the margins likely to prevail if the *Orders* were to be revoked, is provided in the accompanying Issues and Decision Memorandum.[9] A list of the topics discussed in the Issues and Decision Memorandum is attached in the Appendix to this notice. The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *https://access.trade.gov.* In addition, a complete version of the Issues and Decision Memorandum can be directly accessed at *https://access.trade.gov/frnotices.*

## Final Results of Sunset Reviews

Pursuant to sections 751(c)(1), 752(c)(1) and (3) of the Act, Commerce determines that revocation of the *Orders* would be likely to lead to continuation or recurrence of dumping, and that the magnitude of the dumping margins likely to prevail would be weighted-average dumping margins up to 144.16 percent for Japan and 97.86 percent for China.

## Notification Regarding Administrative Protective Orders

This notice also serves as the only reminder to parties subject to administrative protective order (APO) of their responsibility concerning the return or destruction of proprietary information disclosed under APO in accordance with 19 CFR 351.305. Timely notification of the return or destruction of APO materials, or conversion to judicial protective, orders is hereby requested. Failure to comply with the regulations and terms of an APO is a violation which is subject to sanction.

## Notification to Interested Parties

We are issuing and publishing these final results in accordance with sections 751(c), 752(c), and 777(i)(1) of the Act, and 19 CFR 351.218 and 19 CFR 351.221(c)(5)(ii).

Dated: June 24, 2026.

**Scot Fullerton,**

*Acting Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations.*

## Appendix

### List of Topics Discussed in the Issues and Decision Memorandum

I. Summary
II. Background
III. Scope of the *Orders*
IV. History of the *Orders*
V. Legal Framework
VI. Discussion of the Issues
  1. Likelihood of Continuation or Recurrence of Dumping
  2. Magnitude of the Margins of Dumping Likely to Prevail
VII. Final Results of Sunset Reviews
VIII. Recommendation

[FR Doc. 2026–13104 Filed 6–29–26; 8:45 am]

BILLING CODE 3510–DS–P

[1] *See Antidumping Duty Order: Polyvinyl Alcohol from Japan,* 68 FR 39518 (July 2, 2003) (*Japan Order*); *Antidumping Duty Order: Polyvinyl Alcohol from the People's Republic of China,* 68 FR 56620 (October 1, 2003) (*China Order*) (collectively, *Orders*).

[2] *See Initiation of Five-Year (Sunset) Reviews,* 91 FR 10053 (March 2, 2026).

[3] *See* Domestic Interested Parties' Letter, ''Polyvinyl Alcohol from Japan: Notice of Intent to Participate in Sunset Review,'' dated March 17, 2026; *see also* Domestic Interested Parties' Letter, ''Polyvinyl Alcohol from the People's Republic of China: Notice of Intent to Participate in Sunset Review,'' dated March 27, 2026.

[4] *Id.*

[5] *See* Commerce's Letter, ''Sunset Reviews Initiated on March 2, 2026,'' dated March 24, 2026.

[6] *See* Domestic Interested Parties' Letter, ''Polyvinyl Alcohol from Japan: Substantive Response to the Notice of Initiation,'' dated April 1, 2026 (Substantive Response—Japan); *see also* Domestic Interested Parties' Letter, ''Polyvinyl Alcohol from the People's Republic of China: Substantive Response to the Notice of Initiation,'' dated April 1, 2026 (Substantive Response—China).

[7] *See* Commerce's Letter, ''Sunset Reviews Initiated on March 2, 2026,'' dated April 29, 2026.

[8] *See* Memorandum, ''Issues and Decision Memorandum for the Final Results of the Expedited Fourth Sunset Reviews of the Antidumping Duty Orders on Polyvinyl Alcohol from Japan and the People's Republic of China,'' dated concurrently with, and hereby adopted by, this notice.

[9] *Id.*

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[A–602–813]**

### Silicon Metal From Australia: Final Affirmative Determination of Sales at Less Than Fair Value

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The U.S. Department of Commerce (Commerce) determines that silicon metal from Australia is being, or is likely to be, sold in the United States at less than fair value (LTFV). The period of investigation (POI) is April 1, 2024, through March 31, 2025.

**DATES:** Applicable June 30, 2026.

**FOR FURTHER INFORMATION CONTACT:** Jacob Waddell, AD/CVD Operations, Office VI, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–1369.

**SUPPLEMENTARY INFORMATION:**

## Background

On February 9, 2026, Commerce published the *Preliminary Determination* of sales at LTFV of silicon metal from Australia, in which we also postponed the final determination until June 24, 2026, and invited interested parties to comment on the *Preliminary Determination.*[1] A

[1] *See Silicon Metal from Australia: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination,*

Continued

Filed By: Daniel Green, Filed Date: 6/30/26 9:56 AM, Submission Status: Approved

summary of the events that occurred since Commerce published the *Preliminary Determination,* as well as a full discussion of the issues raised by parties for this final determination, may be found in the Issues and Decision Memorandum.[2] The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *https://access.trade.gov.* In addition, a complete version of the Issues and Decision Memorandum can be accessed directly at *https://access.trade.gov/frnotices.*

### Scope of the Investigation

The product covered by this investigation is silicon metal from Australia. For a complete description of the scope of this investigation, *see* Appendix I.

### Scope Comments

We received no comments from interested parties on the scope of the investigation as it appeared in the *Preliminary Determination.* Therefore, we made no changes to the scope of the investigation.

### Verification

Commerce verified the sales and cost information submitted by Simcoa Operations Pty Ltd. (Simcoa) for use in this final determination, consistent with section 782(i) of the Tariff Act of 1930, as amended (the Act).[3] We used standard verification procedures, including an examination of relevant sales and accounting records, and original source documents provided by Simcoa.

### Analysis of Comments Received

All issues raised in the case and rebuttal briefs submitted by interested parties in this investigation are addressed in the Issues and Decision Memorandum. A list of the issues addressed in the Issues and Decision Memorandum is attached to this notice as Appendix II.

### Changes Since the Preliminary Determination

We made certain changes since the *Preliminary Determination.* For a discussion of these changes, *see* the Issues and Decision Memorandum.

### All-Others Rate

Section 735(c)(5)(A) of the Act provides that the estimated weighted-average dumping margin for all other producers and exporters not individually investigated shall be equal to the weighted average of the estimated weighted-average dumping margins established for individually investigated exporters and producers, excluding rates that are zero, *de minimis,* or determined entirely under section 776 of the Act.

Because there is only one mandatory respondent in this investigation, *i.e.,* Simcoa, and its final dumping margin is not zero, *de minimis,* or based entirely on facts otherwise available, we assigned Simcoa's estimated weighted-average dumping margin to all other producers and exporters, pursuant to section 735(c)(5)(A) of the Act.

### Final Determination

Commerce determines that the following estimated weighted-average dumping margins exist:

| Exporter or producer | Weighted-average dumping margin (percent) |
|---|---|
| Simcoa Operations Pty Ltd. | 6.16 |
| All Others | 6.16 |

### Disclosure

Commerce intends to disclose the calculations performed in connection with this final determination to interested parties within five days of any public announcement or, if there is no public announcement, within five days of the date of publication of this notice in the **Federal Register***,* in accordance with 19 CFR 351.224(b).

### Continuation of Suspension of Liquidation

In accordance with section 735(c)(1)(B) of the Act, Commerce will instruct U.S. Customs and Border Protection (CBP) to continue to suspend liquidation of all entries of subject merchandise, as described in Appendix I of this notice, which were entered, or withdrawn from warehouse, for consumption on or after February 9, 2026, the date of publication of the *Preliminary Determination* in the **Federal Register**. These suspension of liquidation instructions will remain in effect until further notice.

Pursuant to section 735(c)(1)(B)(ii) of the Act and 19 CFR 351.210(d), upon the publication of this notice, we will instruct CBP to require a cash deposit for estimated antidumping duties for such entries as follows: (1) the cash deposit rate for subject merchandise exported by Simcoa is equal to the company-specific estimated weighted-average dumping margin listed in the above table; (2) if the exporter is not a company listed in the table above, but the producer is, then the cash deposit rate is equal to the company-specific estimated weighted-average dumping margins listed for the producer of the subject merchandise in the table above; and (3) the cash deposit rate for all other producers and exporters is equal to the estimated weighted-average dumping margins for all-other producers and exporters listed in the table above.

### U.S. International Trade Commission Notification

In accordance with section 735(d) of the Act, Commerce will notify the U.S. International Trade Commission (ITC) of its final affirmative determination of sales at LTFV. Because Commerce's final determination is affirmative, in accordance with section 735(b)(2) of the Act, the ITC will make its final determination as to whether the domestic industry in the United States is materially injured, or threatened with material injury, by reason of imports or sales (or the likelihood of sales) for importation of silicon metal from Australia no later than 45 days after this final determination. If the ITC determines that such injury does not exist, this proceeding will be terminated, all cash deposits posted will be refunded, and suspension of liquidation will be lifted. If the ITC determines that such injury does exist, Commerce will issue an antidumping duty order directing CBP to assess, upon further instruction by Commerce, antidumping duties on all imports of the subject merchandise entered, or withdrawn from warehouse, for consumption on or after the effective date of the suspension of liquidation, as discussed in the ''Continuation of Suspension of Liquidation'' section above.

### Administrative Protective Order

This notice serves as the only reminder to parties subject to an administrative protective order (APO) of their responsibility concerning the disposition of proprietary information

*and Extension of Provisional Measures,* 91 FR 5711 (February 9, 2026) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM).

[2] *See* Memorandum, ''Issues and Decision Memorandum for the Final Affirmative Determination of Sales at Less Than Fair Value in the Investigation of Silicon Metal from Australia,'' dated concurrently with, and hereby adopted by, this notice (Issues and Decision Memorandum).

[3] *See* Memoranda, ''Verification of the Export Price and Constructed Export Price Sales Response of Simcoa Operations Pty Ltd.,'' dated May 13, 2026; ''Verification of the Cost Response of Simcoa Operations Pty. Ltd. in the Less-than-Fair-Value Investigation of Silicon Metal from Australia,'' dated May 19, 2026.

**Federal Register** / Vol. 91, No. 124 / Tuesday, June 30, 2026 / Notices 39595

disclosed under APO in accordance with 19 CFR 351.305(a)(3). Timely written notification of the return or destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and terms of an APO is a sanctionable violation.

### Notification to Interested Parties

This final determination and notice are issued and published in accordance with sections 735(d) and 777(i) of the Act and 19 CFR 351.210(c).

Dated: June 24, 2026.

**Scot Fullerton,**

*Acting Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations.*

## Appendix I

### Scope of the Investigation

The scope of this investigation covers all forms and sizes of silicon metal, including silicon metal powder. Silicon metal contains at least 85.00 percent but less than 99.99 percent silicon, and less than 4.00 percent iron, by actual weight. Semiconductor grade silicon (merchandise containing at least 99.99 percent silicon by actual weight and classifiable under Harmonized Tariff Schedule of the United States (HTSUS) subheading 2804.61.0000) is excluded from the scope of this investigation.

Silicon metal is currently classifiable under subheadings 2804.69.1000 and 2804.69.5000 of the HTSUS. While the HTSUS numbers are provided for convenience and customs purposes, the written description of the scope remains dispositive.

## Appendix II

### List of Topics Discussed in the Issues and Decision Memorandum

I. Summary
II. Background
III. Changes Since the *Preliminary Determination*
IV. Discussion of the Issues
  Comment 1: Application of Partial Adverse Facts Available to Simcoa's U.S. Sales
  Comment 2: Revised Differential Pricing Analysis
  Comment 3: Application of the Major Input Rule
  Comment 4: General and Administrative Expenses based on Verification Findings
  Comment 5: General and Administrative Expenses based on Insurance Revenue
  Comment 6: Financial Expense Ratio
  Comment 7: By-Product Offset
  Comment 8: Constructed Export Price Indirect Selling Expense
  Comment 9: Duties Charged under the International Emergency Economic Powers Act
V. Recommendation

[FR Doc. 2026–13118 Filed 6–29–26; 8:45 am]

BILLING CODE 3510–DS–P

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[A–570–117, C–570–118]**

## Wood Mouldings and Millwork Products From the People's Republic of China: Continuation of Antidumping Duty Order and Countervailing Duty Order

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** As a result of the determinations by the U.S. Department of Commerce (Commerce) and the U.S. International Trade Commission (ITC) that revocation of the antidumping duty (AD) order and countervailing duty (CVD) order on wood mouldings and millwork products (millwork products) from the People's Republic of China (China) would likely lead to the continuation or recurrence of dumping, countervailable subsidies, and material injury to an industry in the United States, Commerce is publishing a notice of continuation of these AD and CVD orders.

**DATES:** Applicable June 24, 2026.

**FOR FURTHER INFORMATION CONTACT:** David De Falco, Trade Agreements Policy and Negotiations, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–2178.

**SUPPLEMENTARY INFORMATION:**

### Background

On February 16, 2021, Commerce published in the **Federal Register** the AD and CVD orders on millwork products from China.[1] On January 2, 2026, the ITC instituted,[2] and Commerce initiated,[3] the first sunset review of the *Orders,* pursuant to section 751(c) of the Tariff Act of 1930, as amended (the Act). As a result of its reviews, Commerce determined that revocation of the *Orders* would likely lead to the continuation or recurrence of dumping and/or countervailable subsidies, and therefore, notified the ITC of the magnitude of the margins of dumping and/or subsidy rates likely to prevail should the *Orders* be revoked.[4]

On June 24, 2026, the ITC published its determination, pursuant to sections 751(c) and 752(a) of the Act, that revocation of the *Orders* would likely lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time.[5]

### Scope of the Orders

The merchandise subject to the *Orders* consists of wood mouldings and millwork products that are made of wood (regardless of wood species), bamboo, laminated veneer lumber (LVL), or of wood and composite materials (where the composite materials make up less than 50 percent of the total merchandise), and which are continuously shaped wood or finger-jointed or edge-glued moulding or millwork blanks (whether or not resawn). The merchandise subject to the *Orders* can be continuously shaped along any of its edges, ends, or faces.

The percentage of composite materials contained in a wood moulding or millwork product is measured by length, except when the composite material is a coating or cladding. Wood mouldings and millwork products that are coated or clad, even along their entire length, with a composite material, but that are otherwise comprised of wood, LVL, or wood and composite materials (where the non-coating composite materials make up 50 percent or less of the total merchandise) are covered by the scope.

The merchandise subject to the *Orders* consists of wood, LVL, bamboo, or a combination of wood and composite materials that is continuously shaped throughout its length (with the exception of any endwork/dados), profiled wood having a repetitive design in relief, similar milled wood architectural accessories, such as rosettes and plinth blocks, and finger-jointed or edge-glued moulding or millwork blanks (whether or not resawn). The scope includes continuously shaped wood in the forms of dowels, building components such as interior paneling and jamb parts, and

[1] *See Wood Mouldings and Millwork Products from the People's Republic of China: Amended Final Antidumping Duty Determination and Antidumping Duty Order,* 86 FR 9486 (February 16, 2021) and *Wood Mouldings and Millwork Products from the People's Republic of China: Countervailing Duty Order,* 86 FR 9484 (February 16, 2021).

[2] *See Wood Mouldings and Millwork Products from China; Institution of Five-Year Reviews,* 91 FR 151 (January 2, 2026).

[3] *See Initiation of Five-Year (Sunset) Reviews,* 91 FR 125 (January 2, 2026).

[4] *See Wood Mouldings and Millwork Products from the People's Republic of China: Final Results of the Expedited First Sunset Review of the Antidumping Duty Orders,* 91 FR 24173 (May 5, 2026), and accompanying Issues and Decision Memorandum (IDM); and *Wood Mouldings and Millwork Products from the People's Republic of China: Final Results of the Expedited Sunset Review of the Countervailing Duty Order,* 91 FR 24168 (May 5, 2026), and accompanying IDM.

[5] *See Wood Mouldings and Millwork Products from China,* 91 FR 38013 (June 24, 2026) (*ITC Final Determination*).

Barcode: 4930995-02 A-602-813 INV - Investigation

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-602-813
Investigation
**Public Document**
E&C/OVI: JW, AQ

June 24, 2026

**MEMORANDUM TO:** Scot Fullerton
Acting Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

**FROM:** Erin Kearney
Acting Director, Office VI
Antidumping and Countervailing Duty Operations

**SUBJECT:** Issues and Decision Memorandum for the Final Affirmative Determination of Sales at Less Than Fair Value in the Investigation of Silicon Metal from Australia

---

## I. SUMMARY

The U.S. Department of Commerce (Commerce) determines that silicon metal from Australia is being or is likely to be sold in the United States at less than fair value (LTFV), as provided in section 735 of the Tariff Act of 1930, as amended (the Act).

After analyzing the comments submitted by interested parties, and based on our findings at verification, we have made certain changes to the Preliminary Determination[1] with respect to the margin calculations for Simcoa Operations Pty Ltd. (Simcoa), the mandatory respondent in this investigation. We recommend that you approve the positions described in the "Discussion of Issues" section of this memorandum.

Below is a complete list of the issues for which we have received comments from Ferroglobe USA, Inc. and Mississippi Silicon LLC (collectively, the petitioners) and Simcoa:

Comment 1: Application of Partial Adverse Facts Available to Simcoa's U.S. Sales
Comment 2: Revised Differential Pricing Analysis
Comment 3: Application of the Major Input Rule
Comment 4: General and Administrative (G&A) Expenses based on Verification Findings
Comment 5: G&A Expenses based on Insurance Revenue
Comment 6: Financial Expense Ratio
Comment 7: By-Product Offset
Comment 8: Constructed Export Price (CEP) Indirect Selling Expense
Comment 9: Duties Charged under the International Emergency Economic Powers Act

[1] *See Silicon Metal from Australia: Preliminary Affirmative Determination of Sales at Less than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 91 FR 5711 (February 9, 2026) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM).

Filed By: Jacob Waddell, Filed Date: 6/25/26 12:17 PM, Submission Status: Approved
INTERNATIONAL TRADE ADMINISTRATION

Barcode: 4930995-02 A-602-813 INV - Investigation

## II. BACKGROUND

On February 9, 2026, Commerce published the *Preliminary Determination* in this investigation, in which we also postponed the final determination until June 24, 2026.[2] Commerce conducted a verification of Simcoa's sales and cost of productions (COP) in Wellesley, Western Australia, from March 17, 2026, through March 27, 2026.[3] We subsequently requested and received updated home market and U.S. sales databases from Simcoa.[4]

On May 28, 2026, Commerce received case briefs from the petitioners and Simcoa.[5] On June 2, 2026, Commerce received rebuttal briefs from the petitioners and Simcoa.[6]

The period of investigation (POI) is April 1, 2024, through March 31, 2025.

## III. CHANGES SINCE THE *PRELIMINARY DETERMINATION*

Based on the review of the record and comments received from interested parties, we made the following changes from the *Preliminary Determination.* For a complete description of these changes, *see* Simcoa's Final Analysis Memorandum[7] and Simcoa's Final Cost Calculation Memorandum.[8]

- We have updated the home market and U.S. sales data and SAS programs to incorporate the minor corrections we accepted at verification.
- We have revised the G&A expense ratio to exclude the scrap metal offset from the G&A numerator and exclude the same amount from the cost of goods sold (COGS) denominator, reversing the preliminary adjustment whereby we excluded certain insurance claims and added the byproduct offset to the COGS denominator.
- We have revised the financial expenses ratio to include Simcoa's parent company's share of the metal scrap and byproduct offset to the COGS denominator.

---

[2] *See Preliminary Determination*.
[3] *See* Commerce's Memoranda, "Verification of Export Price and Constructed Export Price Sales Response of Simcoa Operations Pty Ltd.," dated May 13, 2026 (Simcoa's Sales Verification Report), and "Verification of the Cost Response of Simcoa Operations Pty Ltd. in the Less-than-Fair-Value Investigation of Silicon Metal from Australia," dated May 19, 2026 (Simcoa's Cost Verification Report).
[4] *See* Simcoa's Letter, "Revised Home Market and U.S. Sales Databases," dated April 10, 2026.
[5] *See* Petitioners' Letter, "Case Brief," dated May 28, 2026 (Petitioners' Case Brief); *see also* Simcoa's Letter, "Case Brief of Simcoa Operations Pty Ltd.," dated May 28, 2026 (Simcoa's Case Brief).
[6] *See* Petitioners' Letter, "Rebuttal Brief," dated June 2, 2026 (Petitioners' Rebuttal Brief); Simcoa's Letter, "Rebuttal Brief of Simcoa Operations Pty Ltd.," dated June 2, 2026 (Simcoa's Rebuttal Brief).
[7] *See* Memorandum, "Final Analysis Memorandum for Simcoa Operations Pty Ltd.," dated June 24, 2026 (Simcoa's Final Analysis Memorandum).
[8] *See* Memorandum, "Cost of Production and Constructed Value Calculation Adjustments for the Final Determination," dated June 24, 2026 (Simcoa's Final Cost Calculation Memorandum)



Filed By: Jacob Waddell, Filed Date: 6/25/26 12:17 PM, Submission Status: Approved

# IV. DISCUSSION OF THE ISSUES

**Comment 1: Application of Partial Adverse Facts Available to Simcoa's U.S. Sales**

The following is a verbatim summary of arguments submitted by the petitioners. For further details, *see* Petitioners' Case Brief at 4-24. Internal citations omitted.[9]

> Simcoa's sales that were further manufactured in the United States represent a substantial portion of its overall U.S. sales. Early in the investigation, Simcoa twice requested that it be excused from responding to Section E of the antidumping duty (AD) questionnaire. Commerce denied Simcoa's requests not once, but twice, reflecting a clear agency determination that the information solicited in the questionnaire was necessary in order to calculate the most accurate AD margin possible, as required by law.
>
> Simcoa is closely affiliated with the U.S. customer, Hemlock Semiconductor (Hemlock), that further manufactured the silicon metal, as well as with another party involved in further manufacturing, Shin-Etsu Handotai Co., Ltd (Handotai). Simcoa's effort to obtain the information requested by Commerce were feeble -- amounting to a single phone call and one email – and fell far short of the "maximum effort" required by the statute and upheld by the courts. At no point did Simcoa offer any proof that it attempted to engage the assistance of its corporate parent, Shin-Etsu Chemical, to obtain the necessary information from Hemlock and Handotai to respond to section E of Commerce's questionnaire.
>
> In the preliminary determination, Commerce wrongly decided not to apply partial facts available with an adverse inference (AFA), and instead applied partial facts available. Curiously, Commerce justified its decision by citing section 782(e) of {the Act}, which contemplates the use of certain information that may not meet all the applicable requirements.
>
> Commerce's reliance on section 782(e) of the Act is unsupported by substantial evidence and not in accordance with law. Section 782(e) sets out five criteria that must be satisfied before its provisions can be invoked. The data submitted by Simcoa satisfy only one of them at most.
>
> Moreover, judicial precedent in a case with a very similar factual background, *Nippon Steel & Sumitomo Metal Corp.*, requires Commerce to reconsider its preliminary determination and instead apply either total or partial AFA.
>
> Commerce should select a partial AFA approach using a rate sufficient to induce future complete cooperation by Simcoa and its affiliates. As partial AFA, Commerce should apply the revised petition rate to the affected sales, which was corroborated during the initiation phase. Alternatively, as partial AFA, Commerce could apply either the highest transaction-specific margin or the lowest net price from among Simcoa's constructed export price sales to the sales at issue.

[9] The internal citations have been omitted for all verbatim arguments of interested parties throughout the document.



Filed By: Jacob Waddell, Filed Date: 6/25/26 12:17 PM, Submission Status: Approved

The following is a verbatim summary of rebuttal arguments submitted by Simcoa. For further details, *see* Simcoa's Rebuttal Brief at 5-16.

> Petitioners continue to baselessly insist that an adverse inference is warranted against Simcoa in this investigation. Petitioners ground their argument in the fact that Simcoa was unable to respond to Section E of the questionnaire, which requested further manufacturing costs and downstream sales made by two entities that Commerce considered to be affiliated with Simcoa. Petitioners argue that because Simcoa did not respond to Section E, an adverse inference is warranted here.
>
> This argument, however, ignores Simcoa's exhaustive efforts to obtain the relevant data to respond to Commerce's requests for information. As is well established, in order for Commerce to apply an adverse inference, the record must show that Simcoa failed to comply with Commerce's requests to the best of Simcoa's ability. The record here plainly does not show that. Simcoa timely pursued multiple different avenues to obtain the data that Commerce requested and was rebuffed at every turn. Simcoa did all that it could, including soliciting the assistance of its corporate parent, to obtain the necessary information, but its alleged affiliates were unwilling and/or unable to comply. The record does not, therefore, support application of an adverse inference to Simcoa because it did all that was within its power to obtain the necessary data to respond, but it was unable to do so for reasons outside of Simcoa's control.

**Commerce's Position:** We disagree with the petitioners and continue to apply facts otherwise available to determine the dumping margin for Simcoa's U.S sales through affiliated U.S. importers, pursuant to sections 776(a) of the Act, for this final determination.

Sections 776(a)(1) and 776(a)(2) of the Act provide that, if necessary information is missing from the record, or if an interested party: (A) withholds information that has been requested by Commerce; (B) fails to provide such information in a timely manner or in the form or manner requested subject to subsections 782(c)(1) and (e) of the Act; (C) significantly impedes a proceeding under the antidumping statute; or (D) provides such information but the information cannot be verified as provided in section 782(i) of the Act, Commerce shall use, subject to subsection 782(d) of the Act, facts otherwise available in reaching the applicable determination.

Section 782(c)(1) of the Act states that Commerce shall consider the ability of an interested party to provide information in the form and manner requested upon a prompt notification by that party that it is unable to submit the information in the form and manner required, and that party also provides a full explanation for the difficulty and suggests an alternative form in which the party is able to provide the information. Section 782(e) of the Act states further that Commerce shall not decline to consider submitted information if all of the following requirements are met: (1) the information is submitted by the established deadline; (2) the information can be verified; (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination; (4) the interested party has demonstrated that it acted to the best of its ability; and (5) the information can be used without undue difficulties.



Filed By: Jacob Waddell, Filed Date: 6/25/26 12:17 PM, Submission Status: Approved

Barcode: 4930995-02 A-602-813 INV - Investigation

For a full timeline of Simcoa's request for relief from reporting the further manufacturing costs and downstream sales data of Hemlock as well as Commerce's analysis of Simcoa's affiliation status with Hemlock, *see Preliminary Determination* PDM at 2-4.

We continue to determine that the information on the record does not contravene the standards of sections 782(c)(1) and 782(e) of the Act, and the record does not demonstrate that Simcoa failed to cooperate to the best of its ability in this investigation. As explained in the *Preliminary Determination*, Simcoa submitted its request for reporting relief and responded to Commerce's subsequent requests for information in a timely manner.[10] Furthermore, Commerce corroborated Simcoa's claims regarding its business arrangements with Hemlock and Handotai during verification and noted no discrepancies with Simcoa's reporting.[11] Though we are continuing to apply facts otherwise available for this final determination, we are also continuing to find Simcoa, Handotai, and Hemlock to be affiliated.[12] Should the U.S. International Trade Commission (ITC) issue an affirmative determination in its concurrent injury investigation and silicon metal from Australia becomes subject to an antidumping duty order, we intend to apply further scrutiny to the business relationship between Simcoa, Handotai, and Hemlock, as well as the latter two companies' sales of further manufactured merchandise in the United States in the first administrative review.

**Comment 2: Revised Differential Pricing Analysis**

The following is a verbatim summary of arguments submitted by Simcoa. For further details, *see* Simcoa's Case Brief at 4-10.

> {Commerce} must revise its "differential pricing methodology" for the final results because the methodology that it used for the preliminary results violates the governing statute and is unreasonable in this case. First, Commerce's methodology was not tailored to the pricing and other conditions present in the U.S. silicon metal market during the POI, in violation of the specific instruction contained in the Statement of Administrative Action (SAA) accompanying the Uruguay Round Agreements Act (URAA). Second, the tolerance that Commerce applied in order to identify a pattern of export transactions with pricing that "differed significantly" was unreasonable and unsuitable for the particular market conditions at issue in this investigation. Commerce must revise its methodology for the final results to comport with the Statute.

The following is a verbatim summary of rebuttal arguments submitted by the petitioners. For further details, *see* Petitioners' Rebuttal Brief at 3-6.

> Commerce should make no changes to the DP methodology it applied in the preliminary determination. A two-percent threshold is a reasonable, uniform measure by which to analyze a respondent's pricing behavior, and the supposed qualitative issues raised by Simcoa have been foreclosed by prior judicial precedent. Moreover, a DP analysis is appropriate in the context of an original

[10] *See* Simcoa's Letters, "Request for a Reporting Exemption," dated June 12, 2025; and "Response to Reporting Exemption Supplemental Questionnaire," dated July 3, 2025.
[11] *See* Simcoa's Sales Verification Report at 4-5.
[12] *See Preliminary Determination* PDM at 4.



Filed By: Jacob Waddell, Filed Date: 6/25/26 12:17 PM, Submission Status: Approved

investigation, despite Simcoa's protestations. A company can arrange its pricing behavior at any time and under any circumstances, regardless of an AD order. Whether its pricing behavior may mask dumping only becomes scrutinized during the context of an AD investigation or review. Lastly, the quarterly costing methodology cannot by, definition, sufficiently address U.S. price differences because that methodology only applies to a respondent's cost of production, not to its pricing behavior, and is a separate component of the AD analysis.

**Commerce's Position:** We disagree with Simcoa and have determined to continue applying the revised differential pricing analysis, including the price difference test with its two percent threshold, for this final determination. The price difference test is consistent with the statute. The U.S. Court of International Trade (CIT) has held that the language in section 777A of the Act affords Commerce flexibility to implement a test that it deems appropriate to identify significant price differences.[13] Moreover, the CIT has sustained Commerce's application of the price difference test and the two-percent threshold as falling within the scope of that flexibility.[14] A two-percent threshold is a reasonable measure of significance and is consistent with other aspects of Commerce's practice in antidumping proceedings as explained below.

As an initial matter, a two-percent threshold is used by Commerce in other contexts to define significance and is consistent with other aspects of Commerce's practice in antidumping proceedings. In the arm's length test conducted pursuant to 19 CFR 351.403(c), Commerce finds that sales to an affiliated customer in the comparison market are not at arm's length and fall outside the ordinary course of trade if the average, product-specific, comparison market prices to an affiliated customer are not within a range of 98 percent to 102 percent of the average, product-specific, comparison market prices to unaffiliated customers (*i.e.*, a plus or minus two-percent difference from the weighted average price to unaffiliated customers). In fact, Commerce has found that average prices to an affiliated customer that differ by at least two percent, and therefore fail the arm's-length test, "differ significantly" from market prices, and are therefore outside of the ordinary course of trade.[15] The distinction of between being within or outside of the ordinary course of trade is a significant difference, as sales which are found to be outside the ordinary course of trade are excluded from Commerce's margin calculations, *i.e.*, excluded from the calculation of normal value (NV).

Moreover, pursuant to sections 733(b)(3) and 735(a)(4) of the Act, the *de minimis* threshold for an estimated weighted-average dumping margin in an investigation is two percent. In other words, an estimated weighted-average dumping margin of at least two percent is significant, and not zero. Commerce has synonymously referred to non-*de minimis* levels of dumping as a "significant" amount of dumping.[16] If a weighted-average difference of two percent between

---

[13] *See Garg Tube Export LLP v. United States*, 740 F.Supp.3d 1355, 1366 (CIT 2024) (*Garg Tube Export*).
[14] *See Toyo Kohan Co. v. United States*, Slip Op. 2026-54 (CIT May 22, 2026) (*Toyo Kohan*) (citing *Garg Tube Export*, 740 F.Supp.3d at 1367). *See also Marmen, Inc. v. United States*, Slip Op. 2026-62 (CIT June 15, 2026).
[15] *See Large Diameter Welded Pipe from the Republic of Turkey: Final Determination of Sales at Less Than Fair Value*, 84 FR 6382 (February 27, 2019), and accompanying Issues and Decision Memorandum (IDM) at Comment 4 ("the prices at issue differ significantly from the prices charged to an unaffiliated company (*i.e.*, they are not within 98 to 102 percent of the price charged for or by an unaffiliated party), which leads us to conclude that these prices are affected by the relationship between Borusan and Borusan Logistik.")).
[16] *See Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 26401 (June 6, 2019), and accompanying IDM at Comment 2 ("Under scenario (4), there is a significant (*i.e.*, non-*de minimis*) amount of dumping…").

U.S. price and NV is significant enough to warrant an affirmative determination of sales at less than fair value, then it is reasonable to conclude that a two-percent price difference is significant within the context of section 777A(d)(1)(b)(ii) of the Act. Furthermore, in an administrative review, the *de minimis* threshold is one half of one (0.5) percent, which suggests that the two percent *de minimis* threshold in investigations is a higher threshold to find sales priced at less than fair value than when Commerce determines the assessment of antidumping duties for POR entries of subject merchandise. According to 19 CFR 351.106(c), in an administrative review, Commerce will treat as *de minimis* any weighted-average dumping margin that is less than 0.5 percent and will liquidate without regard to antidumping duties all entries of subject merchandise during the relevant POR, but antidumping duties will be assessed on entries of subject merchandise if the weighted-average dumping margin is 0.5 percent or greater.

Simcoa's leading argument that the differential pricing test is unsuitable because "it is difficult to imagine how (or why) Simcoa could have deliberately priced the vast majority of its sales to mask dumping when it did not even know it would be subject to a dumping investigation when it was making those sales" is unconvincing. Masked dumping does not require foresight of an impending dumping investigation to occur. Instead, analysis for the masked dumping only becomes an issue within the context of the calculation of a weighted-average dumping margin using the A-to-A method. On the contrary, it is easy to imagine *how* any foreign company could regionally, temporally, or on a customer-specific basis underprice its products, and the *why*, to gain market share in the United States, is self-explanatory. Companies engaging in dumping do not receive notice before the existence of an investigation that they will soon be under investigation.

Given Commerce's consistent implementation of a two-percent threshold in its antidumping proceedings, we disagree with Simcoa's assertion that our current differential pricing test fails to account for fluctuating conditions in the silicon metal market. There is no statutory requirement that Commerce examine the reasons underlying the price differences observed in a respondent's U.S. prices as this "would create a tremendous burden on Commerce that is not required or suggested by the statute."[17] Commerce does not need to determine why the respondent's prices in the U.S. market differ, just that they differ.[18] While Simcoa provided a chart summarizing "commodity grade silicon metal" during the POI, it did not quantify the fluctuations that might exist among prices in the U.S. market and isolate them from the price variance that reflects targeted dumping.[19]

Finally, we also agree with the petitioners' characterization of Simcoa's cost averaging arguments as conflating two separate elements of Commerce's AD methodology.[20] The cost averaging methodology relates to Simcoa's COP whereas the differential pricing test analyzes sales to the U.S. customer. We therefore find no further reason to engage with this line of argument.

---

[17] *See JBF RAK LLC v. United States,* 790 F.3d 1358, 1368 (Fed. Cir. 2015) (*JBF RAK*) (internal quotations omitted).
[18] *See, e.g.*, *Certain Frozen Warmwater Shrimp from India: Final Results of Antidumping Duty Administrative Review; 2023-2024,* 91 FR 5717 (February 9, 2026) (*Shrimp form India*), and accompanying IDM at Comment 1.
[19] *See* Simcoa's Case Brief at 8-9.
[20] *See* Petitioners' Rebuttal Brief at 6.



Filed By: Jacob Waddell, Filed Date: 6/25/26 12:17 PM, Submission Status: Approved

For the reasons described above, we continue to find that two percent is a suitable threshold to examine whether a pattern of prices differs significantly among purchasers, regions, or time periods. We therefore have not made any changes to the revised differential pricing analysis for this final determination.

**Comment 3: Application of the Major Input Adjustment**

The following is a verbatim summary of arguments submitted by the petitioners. For further details, *see* Petitioners' Case Brief at 24-26.

> Simcoa purchased no quartz from unaffiliated parties during the {POI}, but it did report purchasing quartz from a third party prior to the POI and consuming that quartz during the POI. As a result, the value of the quartz purchased from the unaffiliated supplier is part of the reported POI quartz value. Commerce has explained that although it normally compares purchase prices paid to affiliated and unaffiliated suppliers when applying the major input rule, in those rare instances where separate affiliated and unaffiliated consumption values are available, it is more appropriate to rely on consumption values, as explained in *CTL Plate from Germany*. Simcoa provided separate affiliated and unaffiliated consumption values, with most purchases from affiliated parties made at prices below the price paid to the unaffiliated supplier. Therefore, for such purchases, for the purposes of final determination, Commerce should apply a major input adjustment.

The following is a verbatim summary of rebuttal arguments submitted by Simcoa. For further details, *see* Simcoa's Rebuttal Brief at 18-20.

> Petitioners continue to argue that a major input adjustment is warranted for Simcoa's affiliated purchases of quartz based on an inventory movement schedule showing a vanishingly small volume of third-party quartz that was purchased before the POI. This argument fails for several reasons. First, the major input rule applies only when {Commerce} "has reasonable grounds to believe or suspect that an amount represented as the value of {a particular affiliate supplied major} input is less than the cost of production of such input." Petitioners have not alleged and Commerce has not found that Simcoa's quartz sourced from its affiliate was sourced at less than the affiliate's cost of production. The major input rule is therefore not applicable. In addition, the quartz that Petitioners propose to use as the valuation basis for all of Simcoa's POI purchases of quartz was purchased prior to the POI. Petitioners have offered no legal support or argumentation as to why a pre-POI purchase of quartz could lawfully be used to value POI purchases. Finally, Petitioners proposed methodology is inherently distortive in that they propose to value greater than 99.9% of the quartz that Simcoa consumed during the POI using a valuation that is ascribable to, at best, less than 0.1% of Simcoa's POI consumed quartz. This argument simply does not pass muster and must be rejected.

**Commerce's Position:** We agree with Simcoa that no adjustment is warranted, pursuant to the major input rule. Simcoa obtained quartz, a major input in the production of silicon metal, from its affiliated supplier, Simcoa Mines. In the *Preliminary Determination*, we analyzed these purchases in accordance with section 773(f)(3) of the Act, *i.e.*, the major input rule. In doing so,



Filed By: Jacob Waddell, Filed Date: 6/25/26 12:17 PM, Submission Status: Approved

Barcode: 4930995-02 A-602-813 INV - Investigation

we compared the price Simcoa paid its affiliate for the quartz to the affiliate's COP for the quartz.[21] For the final determination, Commerce continues to find that a comparison of Simcoa's average purchase price from its affiliated supplier for the quartz, and Simcoa Mines' actual COP for the quartz provides the best information on the record that is consistent with both the statute and Commerce practice.

Sections 773(f)(2) and (3) of the Act provide guidance to Commerce regarding the treatment of a respondent's transactions with affiliated parties. Specifically, sections 773(f)(2) and (3) of the Act state:

> (2) Transactions Disregarded – A transaction directly or indirectly between affiliated persons may be disregarded if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration. If a transaction is disregarded under the preceding sentence and no other transactions are available for consideration, the determination of the amount shall be based on the information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated.
>
> (3) Major Input Rule - If, in the case of a transaction between affiliated persons involving the production by one of such persons of a major input to the merchandise, the administering authority has reasonable grounds to believe or suspect than an amount represented as the value of such input is less than the cost of production of such input, then the administering authority may determine the value of the major input on the basis of the information available regarding such cost of production, if such cost is greater than the amount that would be determined for such input under paragraph (2)." Section 773(f)(2) of the Act states that Commerce may disregard transactions between affiliated persons if they do not reflect arm's length values.

Pursuant to these statutory provisions, Commerce determines the value of a major input purchased from an affiliated supplier at the higher of: 1) the price paid by the exporter or producer to the affiliated person for the major input (the "transfer price"); 2) the amount usually reflected in sales of the major input in the market under consideration between unaffiliated parties (the "market price"); or 3) the cost to the affiliated person of producing the major input (the "affiliate's COP").[22] Because this section of the statute does not specify a particular methodology for determining market value, Commerce has established a hierarchy for establishing market value in the application of sections 773(f)(2) and (3) of the Act. Commerce's express preference for market value is a respondent's own purchases of the input

---

[21] *See* Memorandum "Less-Than-Fair-Value Investigation of Silicon Metal from Australia – Cost of Production and Constructed Value for the Preliminary Determination – Simcoa Operations Pty. Ltd.," dated January 28, 2026 (Preliminary Cost Calculation Memorandum).

[22] *See* 19 CFR 351.407(b).



Filed By: Jacob Waddell, Filed Date: 6/25/26 12:17 PM, Submission Status: Approved

from unaffiliated suppliers.[23] When no such purchases are available, Commerce looks to the affiliated supplier's sales of the input to unaffiliated parties and, lacking that, to any reasonable source for market value.[24] In this investigation, there were no purchases from unaffiliated suppliers, nor sales made by the affiliated supplier to an unaffiliated customer during the POI. In such a situation, Commerce may rely on the supplier's COP as a surrogate for market price.[25] Thus, in the *Preliminary Determination*, we compared the transfer price to the affiliate's COP, and, finding that the transfer price was the higher value, we made no adjustment.[26]

The petitioners argue that Simcoa had pre-POI unaffiliated purchases of quartz that were consumed during the POI; therefore, Commerce should rely on these unaffiliated consumption values as the market price for quartz. Citing *CTL Plate from Germany*, the petitioners contend that, in those rare instances where separate affiliated and unaffiliated consumption values are available, it is more appropriate to rely on consumption values.[27] We disagree that *CTL Plate from Germany* supports the use of the unaffiliated consumption values in the instant investigation. In fact, the CIT questioned Commerce's use of non-contemporaneous consumption values in its major input analysis.[28] Accordingly, in the redetermination concerning *CTL Plate from Germany*, Commerce eliminated the consumption values from unaffiliated suppliers that had significant POI beginning balances or had no purchases during the POI.[29] Commerce's revised major input analysis, which excluded unaffiliated consumption values that reflected pre-POI prices from unaffiliated suppliers, was sustained by the Court.[30] Thus, if we apply this method of analysis to the instant investigation, the quartz consumption value that reflects pre-POI purchase prices will be eliminated, and there will be no remaining unaffiliated consumption values available for market price. Therefore, for the final determination, because no POI market price is available for comparison, we relied on a comparison of the transfer price with the affiliated supplier's COP of the quartz in the major input analysis. Based on this comparison, the transfer price is higher than Simcoa Mines' COP; therefore, we find that no adjustment is warranted for the final determination.

---

[23] *See, e.g.*, *Certain Hot-Rolled Steel Flat Products from Brazil: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 81 FR 53424 (August 12, 2016) (*Hot-Rolled Steel from Brazil*), and accompanying IDM at Comment 7; *Notice of Final Determination of Sales at Less Than Fair Value and Negative Critical Circumstances Determination: Bottom Mount Combination Refrigerator-Freezers from the Republic of Korea*, 77 FR 17413 (March 26, 2012) (*Refrigerators from Korea*), and accompanying IDM at Comment 17; and *Final Results of Antidumping Duty Administrative Review: Silicomanganese from Brazil*, 69 FR 13813 (March 24, 2004) (*Silicomanganese from Brazil*), and accompanying IDM at Comment 7.

[24] *See, e.g.*, *Hot-Rolled Steel from Brazil* IDM at Comment 7; *Refrigerators from Korea* IDM at Comment 17; and *Silicomanganese from Brazil* IDM at Comment 7.

[25] *See, e.g.*, *Certain Steel Nails from Malaysia: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 9753 (March 18, 2019), and accompanying IDM at Comment 2.

[26] *See* Preliminary Cost Calculation Memorandum.

[27] *See Less-than-Fair-Value Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany*, 82 FR 16360, (March 29, 2017) (*CTL Plate from Germany*), and accompanying IDM at Comment 31.

[28] *See Final Results of Second Redetermination Pursuant to Court Remand, AG Der Dillinger Hüttenwerke v. United States*, Slip. Op. 21-101, dated January 19, 2022 (*Final Remand*) (ACCESS barcode 4203167-01)

[29] *See AG Der Dillinger Hüttenwerke v. United States*, Slip Op. 23-160 (CIT November 15, 2023) (*AG Der Dillinger Hüttenwerke*).

[30] *Id*.



Filed By: Jacob Waddell, Filed Date: 6/25/26 12:17 PM, Submission Status: Approved

Barcode: 4930995-02 A-602-813 INV - Investigation

**Comment 4: G&A Expenses Based on Verification Findings**

The following is a verbatim summary of arguments submitted by the petitioners. For further details, *see* Petitioners' Case Brief at 26-27.

> Commerce should use the updated G&A ratio it calculated at verification to account for the scrap metal offset.

No other interested parties commented on this issue.

**Commerce's Position:** We agree with the petitioners. For the final determination, we have adjusted Simcoa's G&A expense ratio for the scrap metal sales revenues. First, we agree with the petitioners that the metal scrap sales revenues were erroneously claimed both as a scrap offset in the reported COM and again as an offset to G&A expenses.[31] Therefore, we excluded the amount from the G&A expenses numerator of the calculation (*i.e.*, we increased G&A expenses).[32] In addition, we agree with the petitioners that Simcoa failed to adjust the COGS denominator of the calculation to include the scrap metal offset.[33] Furthermore, based on our verification findings, Simcoa also failed to account for the silica fume, charcoal fines, dross, and sawdust byproduct offsets that were included in its per-unit cost of manufacturing.[34] For the ratio to be arithmetically correct, the denominator must be on the same basis as the cost to which the ratio is applied. Because the product-specific cost to which the G&A expense ratio is applied has been reduced by the scrap metal and byproduct offsets, the denominator of the ratio (the total cost of all products) must likewise be reduced by the scrap metal and byproduct offsets. Therefore, for the final determination we also adjusted the COGS denominator to the G&A expense ratio to include the scrap metal and byproduct offsets (*i.e.*, we decreased the COGS).[35]

**Comment 5: G&A Expenses Based on Insurance Revenue**

The following is a verbatim summary of arguments submitted by Simcoa. For further details, *see* Simcoa's Case Brief at 15-16.

> For the *Preliminary* {*Determination*}, Commerce declined to include certain revenues associated with insurance claims that Simcoa had reported as part of Commerce's calculation of Simcoa's {G&A} expense. At verification, however, Commerce confirmed that both the costs and revenues associated with one of these claims had been booked during the POI. Commerce should revise its G&A expense calculation for the final results to recognize the revenue associated with this claim.

The following is a verbatim summary of rebuttal arguments submitted by the petitioners. For further details, *see* Petitioners' Rebuttal Brief at 10.

---

[31] *See* Cost Verification Report at 16.
[32] *See* Memorandum, "Less-Than-Fair-Value Investigation of Silicon Metal from Australia, Cost of Production and Constructed Value Calculation Adjustments for Final Determination – Simcoa Operations Pty. Ltd.," dated concurrently with this memorandum (Final Cost Calculation Memorandum).
[33] *See* Cost Verification Report at 16.
[34] *Id.* at 15.
[35] *See* Final Cost Calculation Memorandum.



Filed By: Jacob Waddell, Filed Date: 6/25/26 12:17 PM, Submission Status: Approved

Barcode: 4930995-02 A-602-813 INV - Investigation

> The G&A ratio recalculation Commerce performed during the cost verification of Simcoa accounts for the insurance claim, so no further changes {are} needed.

**Commerce's Position** We agree with Simcoa that the preliminary adjustments to exclude the insurance claims should be reversed for the final determination. In the *Preliminary Determination*, we adjusted Simcoa's reported G&A expense to disallow two insurance claims.[36] Commerce's normal practice is to allow insurance proceeds to offset costs up to the amount of the loss.[37] That is, we match the loss resulting from the insured event with the proceeds received for that event.[38] At verification, we confirmed that for one insurance claim, both the proceeds and the related costs were properly recorded during fiscal year 2024.[39] Further, the insurance proceeds did not exceed the expenses incurred. For the other insurance claim, the proceeds were recorded outside of fiscal year 2024; therefore, the amount was not included in Simcoa's reported G&A expenses and our preliminary adjustment was not warranted.[40] Therefore, for the final determination, we have reversed our preliminary adjustments related to Simcoa's insurance proceeds.

**Comment 6: Financial Expense Ratio**

The following is a verbatim summary of arguments submitted by the petitioners. For further details, *see* Petitioners' Case Brief at 27.

> Commerce should recalculate Simcoa's interest expense ("INTEX") ratio using the revised denominator, as done at verification.

No other interested parties commented on this issue.

**Commerce's Position:** For the final determination, consistent with our discussion at Comment 4 above, we revised the financial expense ratio to include the scrap metal and byproduct offsets in the COGS denominator of the ratio so that it is on the same basis as the per-unit cost to which the ratio is applied.[41]

**Comment 7: By-Product Offset**

The following is a verbatim summary of arguments submitted by Simcoa. For further details, *see* Simcoa's Case Brief at 13-15.

> In computing Simcoa's costs for the preliminary results, Commerce declined to allow Simcoa to offset some of its production costs by certain offsetting revenues associated with Simcoa's production and sale of undersized quartz. This treatment, however, fails to recognize the vertically integrated nature of Simcoa's production operation, which extends from extraction of quartz from the mines that are operated

---

[36] *Id*.
[37] *See Certain Durum Wheat and Hard Red Spring Wheat from Canada: Final Determination of Antidumping Duty Investigation*, 68 FR 52741 (August 28, 2003), and accompanying IDM at Comment 19.
[38] *Id*.
[39] *See* Cost Verification Report at 15-16.
[40] *Id*.
[41] *See* Final Cost Calculation Memorandum.



Filed By: Jacob Waddell, Filed Date: 6/25/26 12:17 PM, Submission Status: Approved

Barcode: 4930995-02 A-602-813 INV - Investigation

> by Simcoa Mines through the production of finished silicon metal. Commerce's approach is distortive in that it ignores offsetting revenues generated from sales of byproducts that are squarely generated as part of Simcoa's vertically integrated silicon metal production operation. Commerce should revise its approach for the final results to comport with Commerce's obligation to ensure that its cost computation "reasonably reflects and accurately captures all of the actual costs incurred in producing and selling the product under investigation or review."

The following is a verbatim summary of rebuttal arguments submitted by the petitioners. For further details, *see* Petitioners' Rebuttal Brief at 8-10.

> Commerce should continue to exclude the claimed byproduct offset for undersized quartz because substantial record evidence demonstrates that the material was generated during Simcoa Mines' quartz extraction and sizing operations, rather than during the production of silicon metal. The fact that Simcoa Mines operates within an integrated corporate structure does not alter the source of the byproduct or transform a byproduct of quartz production into a byproduct of silicon metal production.

**Commerce's Position:** We disagree with Simcoa. For the final determination, we have continued to disallow Simcoa a by-product offset for the undersized quartz generated by Simcoa Mines. Simcoa argues that it is a vertically integrated silicon metal producer and that Simcoa Mines operates the quartz mine that supports Simcoa's silicon metal production operation. Thus, Simcoa claims that Simcoa Mines is essentially a division of Simcoa and that Simcoa Mines' byproducts should be allowed to offset Simcoa's production costs. We disagree. We find the undersized quartz is a byproduct of its affiliate's quartz production, not a byproduct of Simcoa's silicon metal production. Simcoa essentially argues that we should treat these transactions as though Simcoa and Simcoa Mines are a single entity. However, these companies are neither a single entity for legal purposes nor have they been collapsed by Commerce and treated as a single entity in this antidumping investigation. Thus, we agree with the petitioners that Simcoa Mines is a separate legal entity engaged in quartz mining activities and that Simcoa is a separate legal entity engaged in silicon metal production. Therefore, the byproducts generated by Simcoa Mines are a result of its quartz production and not a byproduct of Simcoa's silicon metal production. Accordingly, we determine that it is not appropriate to offset Simcoa's silicon metal production with the value of byproducts generated by Simcoa Mines.

Simcoa also contends that disallowing the byproduct offset distorts Simcoa's costs in direct contradiction of the SAA's instructions that "cost{s} should shall be allocated using a method that reasonably reflects and accurately captures all of the actual costs incurred in producing and selling the product under investigation or review."[42] We disagree that excluding the value of undersized quartz that is produced during the production of quartz is distortive to the cost of production for silicon metal. Commerce's practice with respect to byproduct offsets is to allow offsets based on the value of the byproduct generated during the production of the merchandise under consideration, once the byproduct has been shown to have commercial value, through

[42] *See* Simcoa's Brief at 14 (citing Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994) (SAA)).



Filed By: Jacob Waddell, Filed Date: 6/25/26 12:17 PM, Submission Status: Approved

Barcode: 4930995-02 A-602-813 INV - Investigation

evidence of sales or reintroduction into the production process.[43] As we noted above, these two companies are separate legal entities; therefore, the revenue associated with the sales of the byproducts generated by an affiliate during the production of a raw material cannot be offset with the costs incurred by the entity producing the subject merchandise. In this case, Simcoa Mines produced undersized quartz byproducts during the production of quartz. Therefore, it is Simcoa Mines who must benefit from the scrap revenue offset and not another separate legal entity producing downstream products.

Lastly, Simcoa argues that, at a minimum, the undersized quartz that Simcoa Mines transferred to Simcoa free of charge must be recognized as part of the byproduct offset. Simcoa Mines produced the undersized byproducts during the production of quartz and recognized the cost for these byproducts in its normal books and records. By transferring these byproducts free of change to Simcoa, Simcoa Mines is absorbing a loss for Simcoa to benefit from the sale of the byproducts. Once again, because these two affiliates are separate legal entities, Simcoa cannot claim an offset for byproducts generated during Simcoa Mines' production. Moreover, we find that Simcoa's sales of the undersized quartz that were delivered as raw material inputs but could not be used as raw material inputs, are sales of raw materials. Commerce treats sales of raw materials as akin to a separate line of business and does not allow profits on raw material sales to offset production costs.[44] Thus, we do not find it appropriate to offset Simcoa's cost of silicon metal production with raw material sales revenues. In addition, we have also disallowed the undersized quartz that was intentionally produced by Simcoa Mines and sold to Simcoa for further resale to unaffiliated customers because this revenue is not related to the production of the subject merchandise. Thus, similar to sales of raw materials, the resale of the intentionally produced undersized quartz is a separate line of business that should not be allowed to offset the reported costs. Therefore, for the final determination, we have continued to disallow the offset for undersized quartz byproducts.

**Comment 8: CEP Indirect Selling Expense**

The following is a verbatim summary of arguments submitted by the petitioners. For further details, *see* Petitioners' Case Brief at 22-24.

> The INDIRSU ratio that Simcoa reported for its Channel 2 {CEP} sales made through Shintech is fundamentally inaccurate. While an accurate INDIRSU rate should be reported using only the CEP entity's (*i.e.*, Shintech's) data, Simcoa instead relied on an unsupported commingling of its own data with that of Shintech. Simcoa did this because it failed to obtain the necessary information from Shintech, namely information specific to Shintech's selling expenses. Commerce's acceptance of this flawed reporting would free respondents to gerrymander INDIRSU ratios in their favor. Commerce should instead rely on what limited information there is from Shintech's financial statements to determine the INDIRSU ratio.

---

[43] *See Certain Crystalline Silicon Photovoltaic Products from Taiwan: Final Results of Antidumping Duty Administrative Review*; 2014-2016, 82 FR 31555 (July 7, 2017), and accompanying IDM at Comment 17.

[44] *See, e.g., Notice of Final Determination of Sales at Less Than Fair Value: Certain Softwood Lumber Products from Canada,* 67 FR 15539 (April 2, 2002), and accompanying IDM at Comment 4; and *Final Results of Antidumping Duty Administrative Review: Certain Preserved Mushrooms from Indonesia*, 66 FR 36754 (July 13, 2001), and accompanying IDM at Comment 8.



Filed By: Jacob Waddell, Filed Date: 6/25/26 12:17 PM, Submission Status: Approved

Barcode: 4930995-02 A-602-813 INV - Investigation

The following is a verbatim summary of rebuttal arguments submitted by Simcoa. For further details, *see* Simcoa's Rebuttal Brief at 16-18.

> Simcoa calculated an INDIRSU rate based on the financials of its U.S. affiliated reseller, Shintech, Inc. (Shintech). Shintech has a passing and largely clerical involvement in certain of Simcoa's U.S. Sales. Shintech's general line of business is the world's largest producer of polyvinyl chloride (PVC).
>
> As Simcoa described to Commerce in detail in its questionnaire responses, in computing an INDIRSU expense for Shintech, Simcoa performed certain calculations to remove the {G&A} expense components of Shintech's {SG&A}, because the vast majority of Shintech's operations relate to its extensive PVC production and sales operations. Simcoa determined to remove these G&A expenses because they do not relate to Shintech or Simcoa's sales of silicon metal—thus, removing these expenses enabled Simcoa to compute an accurate INDIRSU calculation that more closely approximates the extent of Shintech's expenses that are actually related to sales of subject merchandise.
>
> Unsurprisingly, Petitioners disagree because they would prefer for Simcoa's INDIRSU expense to be larger. This argument, however, is inconsistent with the statute's instruction that only expenses that are related to sales of subject merchandise (and therefore not expenses that have nothing to do with subject merchandise) are to be removed in computing net U.S. price. Commerce should therefore reject Petitioners' argument and continue to compute INDIRSU consistent with Simcoa's methodology as verified by {Commerce}.

**Commerce's Position:** For the final determination, we continue to rely on the indirect selling expense (ISE) ratio as calculated by Simcoa in its Second Supplemental Questionnaire Response.[45] The ISE ratio as calculated by Simcoa relies on using Simcoa's administrative and selling expenses as a proxy for Shintech's.[46]

In establishing CEP, Commerce deducts ISE from gross unit price in accordance with section 772(d)(1)(D) of the Act. Specifically, section 772(d)(1) of the Act provides that Commerce shall reduce CEP by:

> the amount of any of the following expenses generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise (or subject merchandise to which value has been added)
>
> (A) commissions for selling the subject merchandise in the United States;
> (B) expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties;

[45] *See* Simcoa's Letter, "Response to Second Sections B and C Supplemental Questionnaire," dated December 4, 2025 (Simcoa's Second Supplemental Questionnaire Response) at 6-8 and Exhibit S2BC-6a.
[46] *Id*.



Filed By: Jacob Waddell, Filed Date: 6/25/26 12:17 PM, Submission Status: Approved

Barcode: 4930995-02 A-602-813 INV - Investigation

(C) any selling expenses that the seller pays on behalf of the purchaser; and
(D) any selling expenses not deducted under subparagraph (A), (B), or (C).

The SAA explains that Commerce need not use a specific calculation methodology for calculating ISE and merely states that ISE "would be incurred by the seller regardless of whether the particular sales in question are made, but reasonably may be attributed (at least in part) to such sales."[47] Additionally, the CIT has stated that Commerce has wide discretion in the methodology that is uses to calculate ISE because "{t}he statute does not define'{ISE}.'"[48] The CIT has also explained that, "{l}ike the statute, Commerce's regulations are entirely silent as to how Commerce is to calculate {ISE}" and, thus, Commerce has "great discretion as to the methodology used in the calculation of {ISE}."[49] Similarly, the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) has noted that "{t}he statute is ambiguous, as the statute does not define the 'selling expenses' within subsection D" of section 772(d)(1) of the Act."[50]

Given Commerce's broad discretion to calculate ISE that reflects the circumstances of the investigation or review, we find that Simcoa's methodology for calculating ISE is representative of its business practices. As Simcoa has explained, its methodology for calculating ISE involves isolating and removing Shintech's G&A expenses from Shintech's total selling, general and administrative expenses and relying on Simcoa's G&A expenses as a proxy. At verification, we corroborated Simcoa's arguments that Shintech's main role in the sale of silicon metal is to issue invoices on Simcoa letterhead and collect payment from customers before remitting the payment (less freight and commission charges) to Simcoa.[51] We also corroborated claims that Shintech confirms orders with Simcoa officials prior to invoicing customers and that it does not realize any revenue (excepting commission payments) related to the sales of silicon metal.[52] Furthermore, because Shintech's primary business is the production and sale of polyvinyl chloride materials (*i.e.*, PVC materials), we agree with Simcoa that its own general and administrative expenses are a reasonable proxy in the ISE calculation. We have therefore continued to apply the ISE ratio reported by Simcoa for the final determination.

**Comment 9: Duties Charged under the International Emergency Economic Powers Act**

The following is a verbatim summary of arguments submitted by Simcoa. For further details, *see* Simcoa's Case Brief at 10-13.

> On one single transaction in Simcoa's U.S. database, Simcoa initially incurred a tariff expense (reported in field USDUTYU). This expense was incurred pursuant to a tariff measure that was adjudged to be unlawful by the U.S. Supreme Court, and the U.S. Government is in the process of returning tariffs paid by importers to

[47] *See* SAA, 824.
[48] *See Heveafil Sdn. Bhn., and Filati Lastex Sdn. Bhn. v. United States*, Slip Op. 01-22 (CIT February 27, 2001); *see also DuPont Teijin Films China Ltd. v. United States*, 7 F.Supp.3d 1338, 1352 (CIT 2014) ("Commerce is not obligated by statute to calculate {the ISE ratio} in any particular way.").
[49] *See United States Steel Corp. v. United States*, 712 F.Supp.2d 1330, 1337 (CIT 2010) (citing *NSK Ltd. v. United States*, 358 F. Supp. 2d 1276, 1290-91 (CIT 2005)) ("Indeed, this court has previously underscored – in the context of calculating {ISE} – that '{b}oth methodology, and thus Commerce enjoys discretion in choosing its methodology.'")); *see also Timken Co. v. United States*, 209 F.Supp.2d 1373, 1381 (CIT 2002)
[50] *See Micron Tech. Inc. v. United States*, 243 F.3d 1301, 1308 (Fed. Cir. 2001).
[51] *See* Simcoa's Sales Verification Report at 7.
[52] *Id.*



Filed By: Jacob Waddell, Filed Date: 6/25/26 12:17 PM, Submission Status: Approved

> the U.S. importing public. Given that, in light of these circumstances, this tariff expense was only temporary (*i.e.*, the tariff expense will be nullified when the Government returns to Simcoa the tariffs that it paid in relation to this one transaction), Commerce should "zero out" field USDUTY in relation to this transaction when Commerce computes Simcoa's dumping margin in this investigation.

The following is a verbatim summary of rebuttal arguments submitted by the petitioners. For further details, *see* Petitioners' Rebuttal Brief at 6-8.

> Commerce should determine that it is appropriate to include IEEPA duties within the USDUTYU field and to deduct them in order to calculate the U.S. net price. Their inclusion is necessary because the statute requires duties to be deducted that were incident to bringing the subject merchandise from the country of export to the U.S. market. Doing so ensures an apples-to-apples comparison of U.S. price to normal value (NV), as the latter does not bear U.S. import duties.

**Commerce's Position:** We agree with the petitioners and have included Simcoa's duty charges related to the International Emergency Economic Powers Act (IEEPA) tariffs in the USDUTYU field and have deducted them in order to calculate U.S. net price. Regardless of the legality of the IEEPA tariffs, the record contains no evidence to directly tie the reported duty charges for this one sale specifically to the IEEPA tariffs. Rather, the record indicates that these duty amounts were included in the U.S. price, and there is nothing on the record indicating that Simcoa received a refund for these duties during the POI.

In its case brief, Simcoa argues that failing to remove this IEEPA charge "would be contrary to the requirement that Commerce's margin calculations reflect only the costs associated with production and sale of subject merchandise since Simcoa will not bear an IEEPA expense in relation to any of its U.S. sales."[53] However, pursuant to section 772(c)(2)(A) of the Act, Commerce reduces CEP by any "the amount, if included in such price, of any … United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place delivery in the United States." Absent evidence that Simcoa received a refund for this charge, Commerce is unable to make a determination regarding an event that *might* occur in the future, nor is Commerce relieved from statutory direction to deduct import duties from CEP.

Further, Simcoa's terms of sale to the U.S. customer for this transaction includes the payment of U.S. duties. There is no evidence that Simcoa separately invoiced the U.S. customer for this duty charge, and, therefore, this duty charge must be considered to be part of the price paid for the subject merchandise and reported to Commerce as the U.S. price for this transaction. As such, we therefore find it is appropriate to deduct IEEPA tariffs from reported U.S. price when calculating the export price for this transaction pursuant to section 772(c)(2)(A) of the Act..

---

[53] *See* Simcoa's Case Brief at 12.



Filed By: Jacob Waddell, Filed Date: 6/25/26 12:17 PM, Submission Status: Approved

## V. RECOMMENDATION

Based on our analysis of the comments received, we recommend adopting the above positions. If these recommendations are accepted, we will publish the final determination and the final estimated weight-average dumping margins in the *Federal Register* and will notify the ITC of our determination.

| | |
|---|---|
| ☒ | ☐ |
| Agree | Disagree |

X

Signed by: SCOT FULLERTON

Scot Fullerton
Acting Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations



Filed By: Jacob Waddell, Filed Date: 6/25/26 12:17 PM, Submission Status: Approved